IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TARAN ASSET MANAGEMENT, LLC, | |
| Plaintiff, | |
| v. | No. |
| MARK VARACCHI, JASON RHODES, CONCEPT FUND SERVICES, LLC f/k/a CONCEPTONE LLC, SKYHAWK CAPITAL PARTNERS, LLC, J. LAUREN HOLDING CO. INC. d/b/a ADVANCED DATA INTEGRATION, PARALLEL COMPUTATIONS, INC., COMMUNIQUE COMPLIANCE & COMMUNICATIONS, LLC, a/k/a COMMUNIQUE, LLC d/b/a C3, LLC, SENTINEL GROWTH FUND MANAGEMENT LLC, BASELINE ADVISORS LLC, RADAR ALTERNATIVE FUND LP and UNKNOWN JOHN DOES, | |
| Defendants. | |

## **COMPLAINT**

Plaintiff Taran Asset Management, LLC ("TAM") respectfully files its Complaint against Defendants Mark Varacchi ("Varacchi"), Jason Rhodes ("Rhodes"), Concept Fund Services, LLC f/k/a ConceptONE LLC ("Concept"), Skyhawk Capital Partners, LLC ("Skyhawk"), J. Lauren Holding Co. Inc. d/b/a/ Advanced Data Integration ("ADI"), Parallel Computations, Inc. ("Parallel"), Communique Compliance & Communications, LLC, a/k/a Communique, LLC d/b/a C3, LLC ("C3"), Sentinel Growth Fund Management LLC (Sentinel Growth"), Baseline Advisors LLC ("Baseline") and Radar Alternative Fund LP ("Radar" and, collectively with Sentinel Growth and Baseline, "Sentinel"), and unknown John Does. In support of its Complaint, TAM states as follows:

## INTRODUCTION

1.  TAM is an asset management company for a hedge fund – Taran Capital US Fund, LLP ("Taran Capital").

2.  Just like any other company in the financial industry, TAM necessarily relies upon the loyalty and fidelity of its operations and risk officers in order to achieve success.

3.  Between February 2012 and March 2015, Varacchi served as TAM's chief operations officer.

4.  Between April 2012 and June 2013, Varacchi engaged Concept to provide risk management services to TAM.

5.  In his capacity as Concept's director of its risk management group, Rhodes was authorized by Concept to provide TAM with risk management services and effectively serve as TAM's outside chief risk officer.

6.  While serving as TAM's operations and risk officers, Varacchi and Concept, through Rhodes, used their respective positions of authority to falsify, manufacture and otherwise manipulate TAM's financial accounts, employment records, payroll records, accounts payable invoices, and other of TAM's books and records, in order to divert TAM's funds to each of Defendants, including Sentinel, which is a hedge fund created by Varacchi and Rhodes in April 2013.

7.  Varacchi's unlawful misconduct occurred under Concept's supervision and with the assistance of Rhodes.

8.  During a comprehensive audit of its books and records in the fall of 2015, TAM discovered that Varacchi and Concept, through Rhodes, embezzled more than $980,000.00 from the company.

9. Based on the actions referenced above and set forth in greater detail herein, TAM seeks to recover for damages suffered as a result of the unlawful conduct by Defendants. Specifically, this action asserts claims for: (1) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (the "CFAA") (Count I); (2) violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* ("RICO") (Count II); (3) breach of fiduciary duty (Count III); (4) aiding and abetting breach of fiduciary duty (Count IV); (5) unjust enrichment (Count V); (6) civil conspiracy (Count VI); (7) negligent misrepresentation (Count VII); and (8) fraudulent misrepresentation (Count VIII).

## THE PARTIES

10. Taran Asset Management, LLC is a Delaware limited liability company, with its principal place of business located in Highland Park, Illinois. Taran Asset Management, LLC's sole member is Christopher Gleason ("Gleason"), who is a citizen of Illinois. Gleason's principal place of residence is located in Highland Park, Illinois.

11. Varacchi is an individual who is a citizen of Connecticut. Varacchi's principal place of residence is located in Norwalk, Connecticut.

12. Rhodes is an individual who is a citizen of Connecticut. Rhodes's principal place of residence is located in Norwalk, Connecticut.

13. Concept is a Delaware limited liability company with its principal place of business in New York. Upon information and belief, Concept's sole member is Anthony Gallo who, on information belief, is a citizen of New York.

14. Skyhawk is a Connecticut limited liability company with its principal place of business located in Connecticut. Upon information and belief, Rhodes is Skyhawk's sole member. Rhodes is a citizen of Connecticut.

15. ADI is a Connecticut corporation with its principal place of business located in Connecticut. Upon information and belief, William Powers ("Powers") is the owner of ADI.

16. C3 is a New York limited liability company with its principal place of business located in New York. Upon information and belief, C3's sole member is Irwin Menken ("Menken") who, on information belief, is a citizen of New York.

17. Parallel is a New York corporation with its principal place of business located in New York. Upon information and belief, Kryspin Ziemski ("Ziemski") is the owner of Parallel.

18. Sentinel Growth is a Delaware limited liability company with its principal place of business located in Stamford, Connecticut. Upon information and belief, Sentinel Growth's members are Varacchi and Rhodes, who are both citizens of Connecticut.

19. Baseline is a Delaware limited liability company with its principal place of business located in New York. Upon information and belief, Baseline's members are Varacchi and Rhodes, who are both citizens of Connecticut.

20. Radar is a Delaware limited partnership with its principal place of business located in New York. Upon information and belief, Radar's partners are Varacchi and Rhodes, who are both citizens of Connecticut.

21. The unknown John Doe defendants are other individuals or corporations who have participated in Defendants' unlawful scheme.

### JURISDICTION AND VENUE

22. The jurisdiction of this Court is based upon diversity of jurisdiction pursuant to 28 U.S.C. § 1332, in that the parties are of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.

23. Additionally, the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the counts alleging violations of the CFAA and RICO present a

-4-

federal question.   The Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367 because they arise out of the same case or controversy.

24.     This Court has personal jurisdiction over the Defendants because, as detailed above and in the following paragraphs, each of them: (i) conducts, engages in or carries on a business or business venture in this State; (ii) committed a tortious act within this State; and/or (iii) is engaged in substantial and not isolated activity in this State.

25.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims occurred in this District.

26.     By way of example only, Gleason primarily managed TAM's business from this District.  In managing TAM's business from this District, Gleason regularly communicated with Varacchi, Rhodes, Concept and Sentinel from this District.   Additionally, Varacchi visited Gleason several times in Illinois, both as TAM's chief operations officer and, separately, on Sentinel's behalf.   Moreover, Concept regularly provided certain services to TAM and, specifically, Gleason, in this District.  Further, Gleason regularly transferred TAM's funds from this District to TAM's accounts in New York, and many of those funds were duplicitously used by Defendants to advance their misconduct.

## FACTUAL BACKGROUND

**A.     Taran's Formation**

27.     On or about February 14, 2012, TAM and Taran Capital (collectively, "Taran") commenced their operations as a hedge fund with a focus on both long and short equity investments.

28.      While Taran Capital was the investing arm of the fund, TAM provided the fund's management services and paid for the fund's expenses, such as rent, payroll, payroll taxes, and other services provided to the fund a whole.

29.     In exchange for TAM's services and payment of the bulk of the fund's expenses, Taran Capital paid TAM a management fee.

30.     According to Taran's operative governance documents, only Gleason, as the fund's sole managing member, was allowed to open, maintain and close bank accounts and draw checks or other orders for payment from the fund.  Similarly, Taran's operative governance documents allowed only Gleason to enter into, make and perform any undertakings that he deemed advisable to conduct the business of the fund.  These responsibilities belonged to Gleason alone unless he appointed an agent to exercise such duties.

31.     Shortly before February 14, 2012, TAM hired Varacchi to serve as TAM's chief operations officer.

32.     Prior to serving as TAM's chief operations officer, Varacchi previously held the same position at Quidnet Capital Partners, LLC ("Quidnet").

33.     On information and belief, Varacchi left Quidnet because he drained Quidnet's assets much in the same way that he later depleted TAM's assets.

34.     As TAM's chief operations officer, Varacchi was responsible for, *inter alia*, developing investor relationships, raising funds, directing TAM's payroll and coordinating Taran's trading files to their respective risk management and account brokerage firms.

35.     Neither Taran nor Gleason, as the fund's managing member, authorized Varacchi to maintain TAM's bank accounts or sign Gleason's name on TAM's behalf.

36.     In April 2012, Varacchi retained Concept to provide TAM with certain risk management, accounting and operational services.

37.     In fact, before being retained by TAM, Concept touted its ability to provide TAM with extensive risk management services, outsourced accounting and operational services, as well as office space.

38.     Concept also represented that, as the director of its risk management group, Rhodes was authorized by Concept to effectively serve as TAM's outside chief risk officer.

39.     TAM reasonably relied on Concept's representations and retained Concept for certain outsourced accounting and operational services.

40.     Additionally, TAM rented certain office space from Concept so that TAM could also have a New York office.

41.     Further, Taran reasonably relied upon the apparent authority of Rhodes to serve as Concept's risk management representative to TAM and thereafter paid Concept for Rhodes services as TAM's outside chief risk officer.

42.     As TAM's outside chief risk officer, Concept, through Rhodes, was responsible for developing and maintaining the quantitative analytics to support TAM's risk monitoring framework for its existing investments, proposed investments and investment strategies. Additionally, Concept, through Rhodes, was responsible for coordinating with the front and back office teams at TAM to ensure that the company operated according to its approved strategies and other risk guidelines.

**B.    Defendants' Fraudulent Misconduct**

43.     Shortly after they commenced providing services for TAM, Varacchi and Concept, through Rhodes, surreptitiously established certain practices regarding Taran's brokerage and bank accounts without the authorization, knowledge or approval of TAM or Gleason, as its managing member.

44.     For example, Varacchi and Concept, through Rhodes, conspired with four companies - specifically, Skyhawk, ADI, C3 and Parallel (collectively, the "Sham Vendors") – so that the Sham Vendors would send invoices to TAM for services that were never provided to the company.

45.     In fact, Varacchi and Concept, through Rhodes, created Skyhawk and ADI by manufacturing company formation documents and fabricating invoices, with each invoice seeking thousands of dollars for services that were purportedly provided to TAM.  True and correct copies of certain invoices from Skyhawk and ADI are attached hereto as Group Exhibit 1 and Group Exhibit 2, respectively.

46.     The other Sham Vendors – C3 and Parallel – are companies that are known to provide services to other companies, but never provided any services to TAM.

47.     According to the bank account information provided by Skyhawk to TAM's accounts payable vendor, Convergex, the address for Skyhawk's principal place of business is Rhodes's home address in Norwalk, Connecticut.

48.     Similarly, the remaining Sham Vendors registered their respective addresses for their principal places of business to the home addresses of Varacchi's business partners and, upon information and belief, co-conspirators.

49.     Specifically, the addresses registered to ADI, C3 and Parallel through Convergex are the home addresses of Messrs. Powers, Menken and Ziemski, respectively.

50.     Importantly, none of the Sham Vendors provided any services to TAM.

51.     In fact, as Varacchi and Concept, through Rhodes, knew all along, TAM paid other entities besides the Sham Vendors for precisely the same services that were supposedly provided by the Sham Vendors.

-8-

52.     Between February 2012 and June 2013, Varacchi and Concept, through Rhodes, embezzled over $430,000.00 from TAM by coordinating payments to the Sham Vendors through TAM's soft-dollar line of credit at Convergex.

53.     Without TAM's knowledge or consent, the payments made by TAM to the Sham Vendors were retained by Varacchi and Concept, through Rhodes, for their benefit and for the benefit of Sentinel – which Varacchi and Rhodes created while serving as TAM's chief operating and risk officers, respectively.

54.     Additionally, TAM paid over $60,000.00 to Concept from its account at Convergex for "risk management" and accounting services that allowed Varacchi and Rhodes to coordinate the embezzlement of TAM's funds to the Sham Vendors.

55.     Moreover, in or around April 2012, Varacchi altered, and forged Gleason's signature on, Taran's brokerage account documents at BTIG, LLC ("BTIG") to make it difficult, if not impossible, for BTIG and Taran's fund administrator, SS&C Technologies ("SS&C"), to communicate with Taran's accounting firm, KPMG.

56.     Specifically, for Taran's account with BTIG, Varacchi updated the brokerage account documents with faulty telephone numbers and addresses for KPMG.

57.     As a result, SS&C and BTIG could not contact KPMG, and vice versa, to ensure that the appropriate "checks and balances" were in place to prevent the corrupt practices of Varacchi and Rhodes.

58.     Further, in or around March 2012, Varacchi recorded himself as the signor for TAM's bank account at J.P. Morgan.

59.     As Varacchi knew at the time that he recorded himself as the signor for TAM's bank accounts at J.P. Morgan, Taran's operative documents expressly provide that Gleason, as

the fund's managing member, is the only eligible signor for any of Taran's documents, including TAM's bank account at J.P. Morgan.

60.     By April 2012, Varacchi obtained an ATM card for TAM's bank account.  This ATM card was issued for Varacchi's use only, and a similar card was not issued to Gleason.

61.     In total, between April 2012 and January 2014, Varacchi used the ATM card over 80 times and spent nearly $25,000 in cash withdrawals or purchases from TAM's account.

62.     As just one example of Varacchi's unauthorized and suspicious use of the ATM card, within just three days between October 9, 2012 and October 11, 2012, Varacchi made eight consecutive cash withdrawals for a total of $3,960.00.

63.     Varacchi's purchases and withdrawals while using the ATM card were made without TAM's authorization, knowledge or consent.

64.     Additionally, between June 2012 and April 2013, Varacchi manipulated TAM's accounting records to reflect that he loaned tens of thousands of dollars to TAM.

65.     After claiming that he made loans to TAM, Varacchi withdrew thousands of dollars from TAM's account at J.P. Morgan and further manipulated TAM's books and records to reflect that the loans he purportedly made were paid back by the company.

66.     In fact, TAM's bank account records reflect that Varacchi never made any loans to the company.

67.     On information and belief, Varacchi noted these embezzled monies as "loans" so that he would not have to report the stolen funds as "income" to the IRS.

68.     Varacchi's falsifications of Taran Management's books and records were made without TAM's authorization, knowledge or consent.

69. Moreover, between April 2012 and March 2013, Varacchi manipulated TAM's employment and payroll records to reflect that the salaries for certain of TAM's employees were higher than their actual salaries.

70. Specifically, Varacchi inflated TAM's accounting records of employee salaries and paid those employees a portion of the salaries stated in those records.

71. Instead, Varacchi collectively kept for his own personal benefit the remaining amount of the affected employees' salaries.

72. To effectuate his scheme, Varacchi manipulated TAM's accounting records to reflect that he paid its employees in full when, in reality, he paid the employees via cashier's checks and represented to them that he was "holding back" the rest of their salaries for purposes of paying federal payroll and social security taxes.

73. To that end, Varacchi requested, and Gleason approved, for TAM to contract with a separate company, TriNet Ambrose, so that TriNet Ambrose would coordinate TAM's payroll and effectuate the proper withholdings and payments of TAM's federal payroll and social security taxes.

74. While Varacchi represented to Gleason that he entered into the payroll contract with TriNet Ambrose on TAM's behalf, Varacchi never did so.

75. For example, on March 3, 2013, Varacchi represented to Gleason that he (Varacchi) coordinated TAM's payment for all of the applicable federal payroll and social security taxes by using the monies accumulated from TAM's management fees.

76. In fact, Varacchi did not coordinate the payment of TAM's federal payroll and social security taxes.

77. Instead, Varacchi collectively kept the monies that TAM earmarked to pay its federal payroll and social security taxes.

78. Between his ATM transactions, payroll manipulations and accounting falsifications, Varacchi embezzled over $550,000.00 from TAM.

79. Varacchi's ATM transactions, payroll manipulations and accounting falsifications were made under Concept's supervision and with the assistance of Rhodes.

80. In total, between February 2012 and December 2013, Varacchi and Concept, through Rhodes, embezzled over $980,000,000.00 from TAM for Defendants' benefit.

81. TAM also suffered additional damages in the form of presently owing the federal payroll and social security taxes that, contrary to his representations, Varacchi did not previously pay on TAM's behalf.

**C.     Varacchi and Rhodes Leave Taran for Sentinel**

82. In or around April 2013, TAM ceased its operations.

83. As a result, Concept and Rhodes stopped purporting to provide TAM with any risk management services.

84. Between June 2013 and March 2015, Varacchi served as TAM's outside chief operations officer while TAM was in the process of restructuring its business for a relaunch.

85. During this period, Varacchi and Rhodes operated Sentinel, a competing hedge fund which was formed in April 2013.

86. On information and belief, Varacchi and Rhodes used certain of the funds that they embezzled from TAM to create Sentinel.

**D.     TAM Uncovers Defendants' Unlawful Misconduct**

87. To conceal Defendants' unlawful misconduct, Varacchi created certain security measures to block Gleason from gaining access to TAM's account at J.P. Morgan.

88.     Specifically, Gleason was blocked from viewing or downloading bank statements for TAM's account at J.P. Morgan.

89.     Rather, Varacchi directed Gleason to other Taran accounts at J.P. Morgan for reference to limited partner contributions to, and withdrawals, from Taran Capital.

90.     As a result, Varacchi kept hidden, and neither TAM nor Gleason could detect, Varacchi's ATM and cashier's check transactions.

91.     Similarly, Varacchi created falsified Convergex reports regarding TAM's soft-dollar line of credit account, so that neither TAM nor Gleason could detect the hundreds of thousands of dollars that were embezzled by Varacchi and Rhodes through TAM payments to the Sham Vendors.

92.     During the summer of 2015, after a concerted effort, Gleason gained complete access to the historical records of TAM's bank account at J.P. Morgan and began to uncover the above-referenced irregularities and misconduct.

93.     In the fall of 2015 TAM performed an audit and investigation into irregularities regarding the company's books and records.

94.     As a result of the irregularities revealed during the audit, TAM became aware of Defendants' above-referenced misdeeds.

### Count I – Violation of Section 1030(a)(4) of the CFAA
**(Against Varacchi and Sentinel)**

95.     TAM incorporates Paragraphs 1 through 94 by reference as if fully set forth herein.

96.     The CFAA provides a private cause of action against anyone who, knowingly and with intent to defraud, accessed a protected computer without authorization or exceeded his

authorized access, and by means of such conduct furthered the intended fraud and obtained valuable information. See 18 U.S.C. § 1030(a)(4).

97.     The CFAA defines a "protected computer" as a computer "which is used in or affecting interstate or foreign commerce or communication." 18 U.S.C. § 1030(e)(2)(b).

98.     The CFAA allows for a private cause of action if there is a "loss to 1 or more persons during any 1-year period ... aggregating at least $5,000 in value." 18 U.S.C. § 1030(c)(4)(A)(i).

99.     TAM's computers are used in and affect interstate commerce by managing the assets of the company's clients in multiple states.

100.     Between February 2012 and June 2013, Varacchi personally exceeded his authorized access with the intent to defraud TAM of its funds by using TAM's computer systems to enrich himself, Rhodes, Concept and the Sham Vendors.

101.     Between April 2013 and June 2013, Varacchi, on Sentinel's behalf, did not have TAM's authorization to access its computer systems with the intent to defraud TAM of its funds and to enrich Sentinel.

102.     Between June 2013 and March 2015, Varacchi exceeded his authorized access with intent to defraud TAM by manipulating TAM's records so as to conceal his fraudulent misconduct.

103.     During the fall of 2015, TAM performed an audit and investigation into irregularities regarding the company's books and records.

104.     As a result of the irregularities revealed during the audit, TAM became aware of Varacchi's above-referenced misdeeds.

105.     As a result of Varacchi's wrongdoings, TAM suffered monetary damages.

-14-

106.     TAM suffered — and continues to suffer — losses in excess of $5,000.00 in a one-year period, including, without limitation, the loss of funds that Defendants embezzled for their personal benefit and the costs to analyze and assess the extent of the wrongful taking of information and transferring of funds from TAM's computers, and the costs to engage a law firm to lead the investigation into Defendants' misdeeds.

WHEREFORE, TAM prays for judgment in its favor and against Varacchi, for compensatory damages, costs and prejudgment interest against Varacchi for their unauthorized access to and fraudulent use of TAM's computer systems, and for such other relief as the Court deems just and proper.

## Count II – Violation of RICO
### (Against all Defendants as an enterprise)

107.     TAM incorporates Paragraphs 1 through 106 by reference as if fully set forth herein.

108.     This Count arises under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO").

109.     Section 1962(c) of RICO provides as follows:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c) (West 1999).

110.     Defendants represent an "enterprise" within the meaning of 18 U.S.C. § 1961(4) which is engaged in, or the activities of which affect, interstate or foreign commerce.

111.     During the period from February 2012 through June 2013, Varacchi and Concept, through Rhodes, controlled and participated in TAM's day-to-day operations and risk

management activities. During this period, Varacchi and Concept, through Rhodes, engaged in multiple schemes designed to defraud and embezzle hundreds of thousands of dollars from TAM.

112. Defendants engaged in or affected interstate commerce as they either transferred or accepted the transfer of interstate wire transfers of TAM's funds.

113. Moreover, Defendants accepted wire transfers of TAM's funds at financial institutions engaging in interstate commerce.

114. Throughout the relevant period, Varacchi and Concept, through Rhodes, coordinated and effected wire transfers of TAM's funds, for a variety of amounts, to Varacchi, Concept, Sentinel and the Sham Vendors for Defendants' benefit.

115. The amount or value of the funds embezzled by Varacchi and Concept, through Rhodes, and transferred to Varacchi, Concept, Sentinel and the Sham Vendors for Defendants' benefit exceeded $1,000.

116. Defendants' unlawful acts of coordinating and accepting extortionate credit transactions and fraudulent wire transfers constitute racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

117. Defendants' continuous, coordinated, related and repeated fraudulent misrepresentations, transfers and related actions constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

118. Defendants conducted, and conspired to conduct, extensive fraudulent activities involving extortionate credit transactions and fraudulent wire transfers of TAM's funds through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) and (d).

119.    This conspiracy manifested itself by and through Defendants' agreement among themselves for Varacchi and Concept, through Rhodes, to falsify invoices, bank account records, employment records and payroll records, and to execute wire transfers of TAM's funds to Varacchi, Concept, Sentinel and the Sham Vendors for Defendants' benefit.

120.    As a direct and proximate result of the above-described violations of 18 U.S.C. § 1962(c) and (d), TAM has suffered injury to its business or property in excess of $980,000.00.

121.    Defendants are liable to TAM for treble damages, together with all costs of this action plus reasonable attorneys' fees, all as provided under 18 U.S.C. § 1964(c).

WHEREFORE, TAM prays for: (i) judgment in its favor and against Defendants in the total amount of all damages suffered by it by virtue of Defendants' wrongful acts; (ii) said judgment against Defendants to include treble damages suffered by reason of injury to TAM's business and property as a result of Defendants' violations of 18 U.S.C. § 1962(c); (iii) an award of costs, interest and attorneys' fees incurred by TAM in bringing this action; and (iv) such other relief that the Court deems just and equitable.

### Count III – Breach of Fiduciary Duty
**(Against Varacchi and Rhodes)**

122.    TAM incorporates Paragraphs 1 through 121 by reference as if fully set forth herein.

123.    While serving as TAM's respective operations and risk officers, Varacchi and Rhodes were entrusted with trade secrets, proprietary material and other confidential information belonging to TAM.

124.    As such, Varacchi and Rhodes owed TAM certain fiduciary duties arising from their positions of confidence in TAM.

125.    The positions of Varacchi and Rhodes and the circumstances of the services provided therefrom created a situation entitling TAM to the undivided loyalty and fidelity of Varacchi and Rhodes during the period that they were supposed to provide such services for TAM.

126.    As such, Varacchi and Rhodes had a duty to act loyally and in the best interests and for the benefit of TAM in all matters during the course of their employment.

127.    Varacchi and Rhodes coordinated and effected various misappropriations of TAM's funds, for a variety of amounts, to themselves, Concept, Sentinel and the Sham Vendors for Defendants' benefit.

128.    Moreover, Varacchi breached his fiduciary duties by falsifying TAM's bank account and payroll records, and by misappropriating TAM's funds to himself and Defendants for their benefit.

129.    Varacchi's manipulations of TAM's bank accounts and accounting books and records were made under Concept's supervision and with the assistance of Rhodes.

130.    As a result of the foregoing breaches, TAM sustained damages in an amount to be proven at trial.

WHEREFORE, TAM prays for judgment in its favor and against Varacchi and Rhodes, to include compensatory damages, punitive damages, costs and prejudgment interest against Varacchi and Rhodes for breaching their fiduciary duties to TAM, and for such other relief as the Court deems just and proper.

### Count IV – Aiding and Abetting Breach of Fiduciary Duty
### (Against Concept, Skyhawk, C3, Parallel, ADI and Sentinel)

131.    TAM incorporates Paragraphs 1 through 130 by reference as if fully set forth herein.

132.    At all relevant times, Concept, Skyhawk, C3, Parallel, ADI and Sentinel knew or should have known that Varacchi and Rhodes owed common-law duties of loyalty to TAM including, without limitation, the duty to act in the best interests of TAM while serving in officer positions to TAM, the duty not to conspire to injure TAM, the duty not to conspire to defraud TAM of hundreds of thousands of dollars and the duty not to utilize TAM's proprietary and confidential information for their own benefit or to benefit Concept, Skyhawk, C3, Parallel, ADI and Sentinel.

133.    Concept, Skyhawk, C3, Parallel, ADI and Sentinel nonetheless encouraged, coordinated, approved of and actively participated in the direction and coordination of the wrongful conduct by Varacchi and Rhodes.

134.    Concept, Skyhawk, C3, Parallel, ADI and Sentinel knowingly coordinated and approved of the wrongful transfer of funds from TAM to them by Varacchi and Rhodes and knowingly accepted said funds.

135.    Through their actions as set forth above, Concept, Skyhawk, C3, Parallel, ADI and Sentinel were aware of their role in actively aiding and abetting Varacchi and Rhodes in breaching their fiduciary duties to TAM.

136.    As a result of the foregoing, TAM sustained damages in an amount to be proven at trial.

WHEREFORE, TAM prays for judgment in its favor and against Concept, Skyhawk, C3, Parallel, ADI and Sentinel, to include compensatory damages, punitive damages, costs and prejudgment interest against Sentinel for aiding and abetting Varacchi's and Rhodes's breach of their fiduciary duties to TAM, and for such other relief as the Court deems just and proper.

## Count V – Unjust Enrichment
### (Against All Defendants)

137.     TAM incorporates Paragraphs 1 through 94 by reference as if fully set forth herein.

138.     Between March 2012 and June 2013, Varacchi made withdrawals and ATM purchases from TAM's bank account at J.P. Morgan, for a variety of amounts, for his own personal benefit and for the benefit of Sentinel.

139.     Additionally, between February 2012 and June 2013, Varacchi and Concept, through Rhodes, coordinated and effected a number of wire transfers of TAM's funds, for a variety of amounts, to Defendants for their benefit.

140.     Defendants received, and unjustly retained, a certain and clear benefit in the form of funds from TAM's accounts which were unlawfully misappropriated by Varacchi and Concept, through Rhodes, to the detriment of TAM.

141.     TAM suffered a substantial detriment because the funds were misappropriated and were never repaid to TAM.

142.     As a result, Defendants were unjustly enriched in an amount not less than $980,000.00.

143.     Defendants' retention of the benefit of those funds violates the fundamental principles of justice, equity and good conscience.

144.     It would be unjust for Defendants to retain the benefits derived from the funds that Defendants unlawfully retained from TAM.

WHEREFORE, TAM prays for judgment in its favor and against Defendants in an amount not less than $980,000.00, including prejudgment interest against Defendants beginning on the date of the unlawful transfers, and for such other relief as the Court deems just and proper.

## Count VI – Civil Conspiracy
### (Against All Defendants)

145.    TAM incorporates Paragraphs 1 through 94 by reference as if fully set forth herein.

146.    Defendants conspired together and with one another to do an unlawful act; namely, to embezzle, transfer and otherwise misappropriate TAM's funds and its proprietary, confidential information without TAM's knowledge or consent.

147.    Defendants executed overt acts in furtherance of the conspiracy including, for example, the creation and/or use of the Sham Vendors by Varacchi and Concept, through Rhodes, in order to transfer and otherwise misappropriate TAM's funds to Defendants, as well as Varacchi's manipulation of TAM's employment, payroll and accounting records in order to further embezzle TAM's funds and conceal Defendants' fraudulent misconduct.

148.    As a result of the foregoing, TAM suffered damages in an amount to be proven at trial.

WHEREFORE, TAM prays for a judgment in its favor and against Defendants, to include preliminary and permanent injunctive relief, compensatory damages, punitive damages, prejudgment interest and its attorneys' fees and costs in filing this suit against Defendants for their civil conspiracy, and for such other relief as the Court deems just and proper.

## Count VII – Negligent Misrepresentation
### (Against Varacchi, Rhodes and Concept)

149.    TAM incorporates Paragraphs 1 through 94 by reference as if fully set forth herein.

150.    As set forth herein, including, for example, Paragraphs 27 to 54, 59 to 76 and 92 to 94, Varacchi and Concept, through Rhodes, made multiple false statements of material fact to TAM with the intent that TAM rely on those misrepresentations so that TAM would continue to

-21-

employ the services of Varacchi and Concept, through Rhodes, and allow them to authorize certain transfers of TAM's funds without TAM's knowledge or consent.

151. Specifically, Varacchi and Concept, through Rhodes, made several misrepresentations to TAM and Gleason, its managing member, regarding the propriety of TAM's books and records.

152. Additionally, Varacchi made several misrepresentations to TAM and Gleason, its managing member, regarding the payment of federal payroll and social security taxes for TAM's employees.

153. Varacchi and Concept, through Rhodes, were careless and negligent in making such misrepresentations.

154. Varacchi and Concept, through Rhodes, continued to represent to TAM that its business operations and accounting practices were not damaged by their conduct, and they knew that TAM would rely on such misrepresentations.

155. By continuing to employ the services of Varacchi and Concept, through Rhodes, TAM did, in fact, rely on those misrepresentations to its detriment.

156. TAM's reliance was reasonable, as Varacchi and Concept, through Rhodes, provided assurances that TAM's business operations and accounting practices were not damaged by their conduct.

157. TAM was injured by its reliance on such misrepresentations by Varacchi and Concept, through Rhodes, in an amount not less than $980,000.00.

158. TAM is entitled to the entry of an order and judgment against Varacchi, Rhodes and Concept, for compensatory damages of not less than $980,000.00, and to such other and further relief as the Court deems just.

WHEREFORE, TAM prays for judgment in its favor and against Varacchi, Rhodes and Concept, for compensatory damages in an amount not less than $980,000.00, plus prejudgment interest, and for such other relief as the Court deems just and proper.

## Count VIII – Fraudulent Misrepresentation
### (Against Varacchi, Rhodes and Concept)

159.    TAM incorporates Paragraphs 1 through 130 by reference as if fully set forth herein.

160.    As set forth herein, including, for example, Paragraphs 27 to 94, Varacchi and Concept, through Rhodes, made multiple false statements of material fact to TAM with the intent that TAM rely on those misrepresentations so that TAM would continue to employ the services of Varacchi, Concept and Rhodes and allow them to authorize certain transfers of TAM's funds without TAM's knowledge or consent.

161.    Specifically, between February 2012 and June 2013, Varacchi and Concept, through Rhodes, made several misrepresentations to TAM and Gleason, its managing member, regarding the propriety of TAM's books and records.

162.    Additionally, during that same period, Varacchi made several misrepresentations to TAM and Gleason, its managing member, regarding the payment of federal payroll and social security taxes for TAM's employees.

163.    Varacchi and Concept, through Rhodes, knew that said misrepresentations of material facts were false.

164.    Varacchi and Concept, through Rhodes, continued to represent to TAM that its business operations and accounting practices were not damaged by their conduct, and they knew that TAM would rely on such misrepresentations.

165.    By continuing to employ the services of Varacchi and Concept, through Rhodes, TAM did in fact rely on those misrepresentations to its detriment.

166.    TAM's reliance was reasonable, as Varacchi and Concept, through Rhodes, provided assurances that TAM's business operations and accounting practices were not damaged by their conduct.

167.    TAM was injured by its reliance on such misrepresentations by Varacchi, Rhodes and Concept in an amount not less than $980,000.00.

168.    TAM is entitled to the entry of an order and judgment in its favor and against Varacchi, Rhodes and Concept, for compensatory damages of not less than $980,000.00, and for such other and further relief as the Court deems just.

WHEREFORE, TAM prays for judgment in its favor and against Varacchi, Rhodes and Concept, for compensatory damages in an amount not less than $980,000.00, plus prejudgment interest and its attorneys' fees and costs in filing this suit against Varacchi, Rhodes and Concept as a result of their fraudulent misconduct, and for such other relief as the Court deems just and proper.

Dated:  April 5, 2016                      Respectfully submitted,

                                           TARAN ASSET MANAGEMENT, LLC


                                           By:    /s/ Michael A. Chabraja
                                                        One of Its Attorneys

Michael A. Chabraja
Brian W. Ledebuhr
Vedder Price P.C.
222 North LaSalle Street
Chicago, Illinois 60601
T:  +1 (312) 609 7500
F:  +1 (312) 609 5005
mchabraja@vedderprice.com
bledebuhr@vedderprice.com

*Counsel for Plaintiff*